# In the United States Court of Federal Claims

No. 20-331
(Filed:  13 August 2020[*])

```
******************************************
WARRIOR SERVICE COMPANY, LLC,      *
                                   *
                 Plaintiff,        *
                                   *
v.                                 *
                                   *
THE UNITED STATES,                 *
                                   *
                 Defendant.        *
                                   *
******************************************
```

Bid protest; Small Business Administration ("SBA"); Service-Disabled Veteran-Owned Small Business ("SDVOSB"); size determination; ostensible subcontractor rule.

*Frank V. Reilly*, of Frank V. Reilly, Attorney at Law, of Ft. Lauderdale, FL, for plaintiff.

*Vincent D. Phillips, Jr.*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, all of Washington, DC, for defendant.  *Christopher J. McClintock*, Trial Attorney, U.S. Small Business Administration, and *Tyler W. Brown*, Attorney, Department of Veterans Affairs, of counsel.

## OPINION AND ORDER

**HOLTE, Judge.**

In this pre-award bid protest, plaintiff, Warrior Service Company, LLC ("plaintiff" or "Warrior") challenges the Small Business Administration's ("SBA") Office of Hearings and Appeals ("OHA") determination that plaintiff does not qualify as a Service-Disabled Veteran-Owned Small Business ("SDVOSB") under the SBA's ostensible subcontractor rule and is therefore ineligible to compete for the Department of Veterans' Affairs ("VA") procurement for oxygen delivery services.  Pending before the Court are plaintiff's and the government's cross-motions for judgment on the administrative record.  For the following reasons, the Court **DENIES** plaintiff's motion and **GRANTS** the government's motion.

## I.  Background

### A.  The Solicitation

---

[*] This opinion was initially filed under seal on 29 July 2020 pursuant to the protective order in this case.  The Court provided the parties 14 days to submit proposed redactions, if any, before the opinion was released for publication.  Neither party proposed redactions.  This opinion is now reissued for publication in its original form.

Case 1:20-cv-00331-RTH   Document 23   Filed 08/13/20   Page 2 of 24


On 9 July 2018, the VA issued Solicitation No. 36C24618R0507 (the "Solicitation") for provision of "Home Oxygen delivery services to all beneficiaries serviced by [Veteran Integrated Service Network ("VISN")] 6." Admin. R. at 5, ECF No. 11 ("AR"). The Solicitation contemplated award of a "Firm Fixed-Price Indefinite-Delivery Indefinite-Quantity (FFP-IDIQ) type single award contract" and was set aside for SDVOSBs. *Id.* at 10, 5. The North American Industry Classification System ("NAICS") code for this procurement was 532283, and the size standard was $32.5 million. *Id.* at 5. "The guaranteed minimum order" was "100 orders per year," with the "guaranteed maximum quantity . . . not exceed[ing] 50,250 orders." *Id.* at 10. The Solicitation provided for an initial one-year base period of performance with four one-year options. *Id.* at 89. This procurement was subject to Federal Acquisition Regulation ("FAR") 52.219-14 Limitations on Subcontracting. *Id.* at 9.

The Performance Work Statement specified, "[t]he contractor shall provide all supplies, materials, equipment, transportation of equipment, equipment services, labor, supervision, patient education, safety management, and infection control, as necessary, for patients on home respiratory care therapy." AR at 53. "Services shall be required 24 hours a day, seven (7) days a week, including holidays." *Id.* The deliveries are to be made to beneficiaries throughout North Carolina and Virginia, with "a possibility of infrequent instances of services required in Maryland, Tennessee, South Carolina, or Georgia." *Id.* The Scope of Work includes new patient set-ups and initial set-ups for oxygen systems; follow up visits; set-ups for CPAP and BiP ap;[1] equipment monitoring, maintenance, and repair; and patient education. *Id.* 53–58, 60–63.

The Solicitation stated, "[t]he Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation is considered the 'Best Value' and will be most advantageous to the Government, price and other factors considered." *Id.* at 170. Additionally,

> This is a tiered evaluation limited to SDVOSB's or [Veteran-Owned Small Business ("VSOB")] concerns. If no offers are submitted by an SDVOSB concern, or if none of the offer[s] submitted by an SDVOSB would result in an award at the fair and reasonable price that would offer the best value to the United States Government, the SDVOSB Set-Aside will then be withdrawn and the Set-Aside for VOSB concerns will then be in effect.

*Id.* The Solicitation listed the following technical factors upon which offerors would be evaluated: (1) "Corporate Experience;" (2) "Personnel Qualifications/Staffing;" (3) "Technical Capability Approach;" and (4) "Equipment Capability." AR at 170. Offerors would also be evaluated on Past Performance and Price. *Id.* The Solicitation stated, "[a]ll Technical Factor[s][,] when combined with Past Performance[,] are more important than Price." *Id.* (emphasis omitted). "To be eligible for award, an offeror must be rated no less than SATISFACTORY based on established evaluation criteria in the non-price factors." *Id.*

---

[1] Continuous Positive Airway Pressure ("CPAP") machines are "device[s] primarily used for the treatment of obstructive sleep apnea." AR at 126. Bilevel Positive Airway Pressure ("BiPAP") machines are "device[s] used for the treatment of obstructive sleep apnea/hypoventilation syndrome while sleeping." *Id.*

Most relevant to this matter, under Technical Factor 1, Corporate Experience, the Solicitation instructed offerors to "provide a narrative addressing [their] relevant technical capabilities," and offerors "must demonstrate at least a minimum of ten (10) years of experience in providing Home Oxygen delivery services." *Id.* at 171.  Under Technical Factor 2, Personnel Qualifications/Staffing, offerors were instructed to:

> a.  Provide resumes of the personnel proposed to work on the contract to include their experience, training, and frequency of training.
>
> b.  Provide a list of all of the professional and administrative staff positions, to include a Project Manager to be utilized in the performance of this contract.
>
> c.  Provide copies of required licenses, diplomas, or training certifications for each employee proposed to work on the contract.

*Id.*  For Factor 5, Past Performance, offerors were required to identify three "federal, state, local government, and or private/commercial contracts of similar scope, size, and complexity that are ongoing or have been completed within the last three years after issuance date of the solicitation." AR at 173.  "In the case of an Offeror without a record of relevant past performance or for whom information on past performance is not available, the Offeror may not be evaluated favorably or unfavorably on past performance."  *Id.*

The Solicitation incorporated Federal Acquisition Regulation 52.212-3, which defines a SDVOSB as a small business concern:

> (i) Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and
>
> (ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.

*Id.* at 175.  A small business concern "means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and size standards in this solicitation."  *Id.* at 175–76.

## B.  Plaintiff's Proposal and Clarifications

Plaintiff submitted its proposal on 2 August 2018.  *Id.* at 2728.   Most relevant to this case, under Technical Factor 1, Corporate Experience, plaintiff detailed its history, since establishment in 2012, of providing "home delivery, set-up, pick-up, repairs, evaluations[,] and patient training on a variety of [durable medical] equipment."  *Id.* at 237.  Specifically, in

response to the Solicitation's instruction that "[t]he Offeror must demonstrate at least a minimum of ten (10) years of experience in providing Home Oxygen delivery services," plaintiff stated:

> Successful [durable medical equipment ("DME")] experience familiarized [plaintiff] with on-time deliveries and in-home setups, logistics[,] and scheduling support that is critical for successful oxygen contract implementation. [Plaintiff] is expanding its Products and Services to Respiratory medical care by subcontracting and teaming with a highly-experienced Respiratory Medical Service Provider, Community Surgical Supply of Toms River, Inc., (Community Surgical Supply (CSS), Inc.). A letter of consent for this subcontracting and teaming agreement is provided for this coordination. CSS has agreed to transfer staff, equipment[,] and Technical Capability to [plaintiff] as needed. . . . [Plaintiff's] delivery and logistics experience in on-time deliveries of DME and reliable scheduling and setup as well as CSS's successful completion of several oxygen contracts along with their qualified . . . staff and proven track records of service will provide complementary experience which will enable successful contract performance.

AR at 171, 237.[2] The rest of plaintiff's proposal under Technical Factor 1 focused on CSS's "over 50 years of industry experience." *Id.* In response to the Solicitation's requirement that offerors "[p]rovide a listing of at least three (3) projects performed within the last three (3) years," plaintiff provided examples of CSS's past contract performance. *Id.* at 173, 238–39.

On 23 August 2018, an individual from the VA contracting office emailed plaintiff seeking clarifications "with regards to the teaming agreement that exists between [plaintiff and CSS,] as well as how CSS will be utilized as a subcontractor in the performance of the contract." *Id.* at 660. The VA requested that plaintiff provide:

- A copy of the teaming agreement between [plaintiff] and CSS
- Clearly describe the work to be performed by [plaintiff] and the work to be subcontracted to CSS. (Description to include equipment maintenance, percentage of personnel, percentage of supervision, etc, and work to be performed).
- Have you had teaming arrangements for Home Oxygen Services in the past, and if so who were your subcontractors on those contracts?

*Id.*

---

[2] The letter of consent referenced in plaintiff's proposal lists the subject line as "Department of the Veterans Affairs Solicitation 36C25018R0234 for VISN 10 Ohio Home Oxygen Services ("Solicitation")." AR at 661. The letter provides, in relevant part: "Pursuant to Factor 3(d) of the Solicitation's Evaluation Factors and Submission Instructions, [CSS] hereby provides its consent to the release of its relevant past performance information to [plaintiff] for the limited purpose contemplated in Factor 3(d) of the Solicitation's Evaluation Factors and Submission Instructions." *Id.*

Plaintiff responded to the clarifications on 26 August 2018. *Id.* at 659. First, plaintiff stated it "does not currently have a teaming agreement with CSS," but "will be subcontracting CSS for the purpose of this contract." *Id.* Next, addressing the allocation of work, plaintiff explained:

> The percentage of personnel, supervision, and work performed will be 75% [plaintiff] and 25% CSS. [Plaintiff] will employ professionals to provide equipment maintenance, quality assurance[,] and VA customer service. [Plaintiff] will also employ the delivery technicians and any additional personnel needed . . . . CSS will employ all of the respiratory therapists, will provide customer service and scheduling support to the veterans as they have extensive product knowledge and expertise in critical care side. CSS will also provide key personnel and Human[] Resources support as they have multiple years of experience in performing these types of federal contracts.

AR at 659. Lastly, plaintiff responded it "has not had or needed teaming arrangements for Home Oxygen Services in the past." *Id.*

On 14 March 2019, the CO notified plaintiff it was an unsuccessful offeror, and the contract was awarded to another offeror.[3] *Id.* at 2345. The letter indicated three offers were evaluated, but did not identify the offerors. *Id.*

## C. The Contracting Officer's Determination of Contractor Non-Responsibility

On 3 October 2019, the Contracting Officer ("CO") issued a Determination of Contractor Non-Responsibility. *Id.* at 658. For background, the CO explained:

> Warrior Service Company, LLC[,] . . . an SDVOSB firm that has never performed home oxygen delivery services[,] stated in their proposal that they were teaming/partnering up with Community Surgical Supply (CSS)[,] . . . a Large Business concern[,] as their sub-contractor in order to be able to successfully perform on this requirement. Throughout the proposal this teaming/partnering agreement is referenced as WSC-CSS[;] however, it is CSS . . . who will be providing most of the necessary personnel, skills expertise, equipment, technical capability[,] and experience needed to successfully perform the vital and primary functions of the requirement as stated in the Performance Work Statement (PWS). Based on the frequent use of the term "WSC-CSS[,]" the Contracting Officer (CO) felt that the entire tenor of [plaintiff's] proposal is that of a team[,] which is a strong indicator of unusual reliance[,] which contravenes the Ostensible Subcontractor Rule.

---

[3] Throughout the record, the procurement is consistently treated as pre-award in 2019 and 2020. The Court cited the 14 March 2019 notice of unsuccessful offeror sent to plaintiff in oral argument and asked the government's counsel for clarification about the status of the contract. Tr. at 71:23–25, ECF No. 20. Counsel for the government confirmed "[n]othing has been awarded yet," and "the government has put a stay in place." *Id.* at 72:1, 3. The record is unclear whether an award was made on 14 March 2019 or what occurred between "August of 2018 and August of 2019." Tr. at 72:20.

*Id.* at 655.  The CO contacted plaintiff for clarification on the allocation of work between plaintiff and its proposed subcontractor.  *Id.*  Plaintiff responded that it would perform 75% of the work, and CSS would perform 25% of the work,[4] "even thou[gh] [plaintiff] has never performed home oxygen delivery services and does not have the necessary experienced, qualified personnel, equipment[,] and capital to be able to perform the required service."  AR at 655.

The CO first noted Dun & Bradstreet "could not establish[] a payment, credit score[,] or working capital which will indicate whether or not [plaintiff] is financially sound to perform the requested services;" therefore, the CO determined plaintiff "does not have adequate financial resources to perform the contract."  *Id.* (emphasis omitted).  Next, the CO stated plaintiff "does not have any past performance information indicating that they have ever performed Home Oxygen Delivery Services," and thus "does not have the ability to comply with the performance schedule."  *Id.* at 656 (emphasis omitted).  Moreover, plaintiff does not have "performance records with previous and/or ongoing contracts that have anything to do with Home Oxygen delivery services," so plaintiff does not have a performance record for these services.  *Id.*  Further, based on plaintiff's representations that CSS would provide "the Registered Respiratory Therapist (RRT), the CDL Driver Technician, Service Technicians, customer services and scheduling support," as well as "provide key personnel and Human Resources support functions . . . which are all the primary and vital tasks of the requirement," the CO determined plaintiff "does not have the necessary organizational experience, accounting, operational controls, technical skills, or the ability to obtain them on their own."  *Id.*

In the findings, the CO noted, "the letter of consent [plaintiff] referred to in their proposal is not a teaming agreement letter but rather a letter of consent authorizing [plaintiff] to use CSS past performance information as relevant past performance information [plaintiff] can submit as requested in the solicitation."  *Id.* at 657.  The CO also indicated the "letter of agreement referenced an RFP number that belongs to VISN 10 and not VISN 6."  AR at 657.  In response to the CO's email requesting clarification, plaintiff "stated that no teaming agreement between [plaintiff] and CSS exists and that [plaintiff] will be subcontracting CSS," which the CO asserted was "not only contradictory[,] but strengthens the CO rational[e] of the Ostensible Rule that [plaintiff] is heavily relying on CSS to perform more than 50% of the work."  *Id.*

Based on these reasons, the CO determined plaintiff was a "Non-Responsible Contractor in accordance with FAR Part 9.1."[5]  *Id.* at 658 (emphasis omitted).  The CO stated plaintiff's and CSS's "teaming agreement falls under the Ostensible Subcontracting Rule," which provides "that an ostensible subcontractor is a subcontractor that is not a similarly situated entity and performs primary and vital requirements of a contract, or . . . is a subcontractor upon which the prime contractor is unusually reliant."  *Id.*  The CO reasoned that CSS is not a similarly situated entity

---

[4] In the Determination of Contractor Non-Responsibility, the CO references the 23 August 2018 request for clarification and plaintiff's 26 August 2018 response, discussed in section I.B.

[5] FAR 9.103(a) provides:  "Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only."  Therefore, "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility.  In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility."  FAR 9.103(b).

because it is a large business, unlike plaintiff, and plaintiff "is heavily reliant on the CSS expertise and resources to be able to perform the required work." *Id.* The CO also reasoned plaintiff's proposal did not comply with FAR 52.219-14 "Limitations on Subcontracting" because CSS is not a similarly situated entity. *Id.* Further, "because the primary and vital functions of this requirement equate to approximately 75% of the total cost associated with this requirement, [plaintiff] cannot meet the 50% rule under FAR 52.219-14."[6] AR at 658. Lastly, the CO stated:

> [A]lthough [plaintiff] will be doing some of the administrative work, such as obtaining vehicles, staffing, etc.[,] those functions will be short-lived and not repetitive tasks that would . . . be performed throughout the life of the contract. Based on this information[,] it appears that CSS, the large subcontractor, will be doing more than 51% of the work since they will be controlling the day to day operations given the nature of Home Oxygen Services and how they are delivered and managed. CSS will be performing the vital components of the contract. We do not believe that [plaintiff], the small business, has the requisite experience or managerial capability to control the project and believe that it will be the large subcontractor, CSS, who will be controlling the means and methods necessary to successfully complete the project.

*Id.*

### D.  SBA Certificate of Competency Application

After the CO's 3 October 2019 Determination of Contractor Non-Responsibility, on 16 October 2019, an individual in the SBA's Office of Government Contracting, Area I, emailed plaintiff documents concerning the Certificate of Competency ("COC") application. *Id.* at 662. The first document contained the SBA's size regulations, located in 13 C.F.R. Part 121. *Id.* at 663–756. The second document was a blank cash flow statement form for plaintiff to complete. *Id.* at 757. The third document was the COC Application Instruction Sheet. *Id.* at 758. The fourth document was SBA Form 355, which requests information about the business and its affiliates. AR at 759–65. Lastly, the fifth document was SBA Form 1531, the Application for COC. *Id.* at 766–71. The form explains, "[t]he Certificate of Competency (COC) program allows a small business to appeal a contracting officer's determination that it lacks the responsibility necessary to perform a specific government procurement on which it is an apparent successful offeror." *Id.* at 766. Plaintiff submitted a complete COC application on 23 October 2019. *Id.* at 775.

On 30 October 2019, Sandy Liu, an industrial specialist in the SBA's Office of Government Contracting, Area I, emailed the CO and another VA employee.[7] *Id.* at 1353. Ms.

---

[6] FAR 52.219-14(c)(1) provides:  "By submission of an offer and execution of a contract, the Contractor agrees that in performance of the contract in the case of a contract for—(1) Services (except construction).  At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern."

[7] Of particular note, in a 28 October 2019 email, Ms. Liu asked the CO whether a bidder can "submit their subcontractor's corporate experience to meet the requirement set forth under Technical Factor 1" of the Solicitation. AR at 1698.  On 5 November 2019, the CO emailed Ms. Liu the following response:

Liu stated that based on her review of the information plaintiff submitted in its COC application and a phone interview with plaintiff, "there is reason to question whether or not they have violated the ostensible subcontractor rule." *Id.* Whether an offeror has violated the ostensible subcontractor rule is properly determined "under the [SBA] size program," rather than the COC program. AR at 1353. Ms. Liu therefore explained, "we will have to put the subject COC case in suspense [and] initiate an SBA Area Director Size Protest." *Id.* Depending on the outcome of the size protest, SBA would revisit plaintiff's COC application. *Id.* Ms. Liu attached the formal letter addressed to the CO suspending plaintiff's COC application "because there is a reason to question the applicant's size status." *Id.* at 1355. Ms. Liu reiterated: "[a]n applicant must be a small business in order to apply for [the] Certificate of Competency program. Therefore, size status of the applicant must be clarified before our office can proceed with this COC. SBA will initiate a formal size determination on [plaintiff]." *Id.*

### E. SBA Area Office Size Determination

On 5 November 2019, Ms. Liu notified plaintiff by email that the SBA suspended plaintiff's COC application for a size determination. *Id.* at 1690. The formal letter attached to the email stated plaintiff's "small business status has been questioned in connection with [its] application for a Certificate of Competency." AR at 1691. Specifically, "[t]he concern is that [plaintiff] may be affiliated with [its] subcontractor, Community Surgical Supply, based on 13 CFR 121.103(h)(4)," more commonly known as the "ostensible subcontractor rule." *Id.* The letter stated the size determination would be based on the information plaintiff submitted in its COC proposal, but offered the opportunity for plaintiff to submit additional information no later than 8 November 2019. *Id.* at 1692.

On 7 November 2019, plaintiff sent Ms. Liu a letter responding to the COC suspension letter. *Id.* at 2205–08. Addressing the government's ostensible subcontractor concerns, plaintiff first clarified that its subcontractor "is performing only 19% of the work." *Id.* at 2205. Plaintiff expressed confusion with the government's concerns because the letter "does not mention any specific factual basis for this concern regarding the ostensible subcontractor rule. . . . Community Surgical is mentioned in name only, leaving [plaintiff] unsure exactly what to address." *Id.* Plaintiff requested further clarification of "any specific and discrete concerns that apply to this procurement." AR at 2205.

Despite the apparent confusion, plaintiff addressed the SBA's concerns under the SBA's four-factor test to disprove unusual reliance under the ostensible subcontractor rule. *Id.* at 2205–08. First, plaintiff asserted its subcontractor is not the incumbent contractor and "has not been

---

No because the government deals only with the prime contractor. Therefore, due to the fact that [plaintiff] does not have the required minimum of ten (10) years of experience outlined in the solicitation we feel that this would hinder the communication and performance of the contract. Due to the size, scope[,] and complexity of this requirement, the offeror must be an experienced provider of home oxygen in order to be able to understand[] and perform the critical functions of the requirement as stated in the Performance Work Statement (PWS).

*Id.*

prohibited from working on this procurement as a subcontractor." *Id.* at 2206. Second, plaintiff "does not intend to hire the majority . . . [or] any of its workforce from Community Surgical." *Id.* (emphasis omitted). Third, plaintiff states its "proposed management did not previously serve with Community Surgical on the incumbent contract" because neither is the incumbent contractor. *Id.* at 2207. Fourth, plaintiff quoted the Solicitation's provision that "an Offeror without a record of relevant past performance . . . may not be evaluated favorably or unfavorably on past performance." *Id.* Based on this provision, plaintiff claimed "although [plaintiff] has the relevant experience, it was not required to have relevant experience." AR at 2207 (emphasis omitted). Plaintiff argued "[a] prime contractor does not become affiliated with a potential subcontractor by receiving a quotation for 19% of the work and then considering that subcontractor for a potential award." *Id.* at 2208. Referring to the government's affiliation concerns as an "improper approach," plaintiff asserts a proper affiliation analysis "would therefore require the SBA to aggregate all subcontractor quotations . . . because they would all be of equal concern." *Id.*

On 12 November 2019, Ms. Liu responded to plaintiff's 7 November 2019 letter and requested additional information for the size analysis. *Id.* at 2212. In response, on 15 November 2019, plaintiff sent Ms. Liu the additional documentation she requested and a letter. *See id.* at 2225–2342. The letter once again expressed confusion and challenged the legitimacy of proceedings before the SBA because plaintiff claimed the CO never made a written referral of plaintiff's bid to the SBA, as required under SBA regulations.[8] *See id.* at 2228. Plaintiff also surmised the VA did not properly refer the matter to the SBA and failed to provide relevant documents to the SBA. AR at 2229. Responding to the SBA's requests for three years of CSS's financial records, plaintiff asserted it does not have those documents and "[t]he Agency and/or the SBA should please explain the basis upon which it believes that [plaintiff] should be able to obtain these confidential documents or be able to force Community Surgical to provide them to the SBA." *Id.* at 2231. Plaintiff acknowledged its subcontractor "is not a small business," but argued "the Solicitation at issue did not require [plaintiff] to only receive quotes from small businesses." *Id.* Plaintiff otherwise refused to submit certain documentation because it deemed the requests irrelevant or improper based on its interpretation of the Solicitation. *See, e.g.*, *id.* at 2232 ("SBA's request is erroneous because there are no 'required licenses' prior to award (see Solicitation).").

On 22 November 2019, the SBA Area Office for Area I issued its size determination. *Id.* at 2346. At the outset, citing 13 C.F.R. § 121.404(a), the SBA Area Office stated it would determine plaintiff's size as of 2 August 2018, the date it submitted its offer, because "SBA determines the size status of a concern . . . as of the date the concern submits a written self-certification that it is small to the procuring activity as part of its initial offer." *Id.* at 2351. Based on a review of plaintiff's proposal, the SBA Area Office determined plaintiff was other than small for this procurement because of its unusual reliance on its subcontractor, which the SBA Area Office considered an ostensible subcontractor. AR at 2353.

---

[8] The SBA Area Office noted in its size determination: "In their response letter dated November 15, 2019, [plaintiff] assumed the Area Office did not have a written COC referral from VA, which is an incorrect statement." AR at 2350 n.2.

The SBA Area Office provided five reasons for its size determination. First, plaintiff does not have home oxygen delivery experience and instead relies on its subcontractor's "vast respiratory services contracts experience" to meet the Solicitation's requirement of a minimum of ten years' experience in home oxygen delivery. *Id.* Second, plaintiff relies on its subcontractor for servicing centers and warehouse facilities. *Id.* at 2353–54. Third, plaintiff "is relying entirely on CSS to provide" the required "concentrators, ventilators, oxygen tanks, and various other equipment." *Id.* at 2354. Fourth, plaintiff's "COC application reveals that [plaintiff] will receive a loan from CSS valued at over $5 million to cover all the equipment and startup working capital. CSS is not in the business of lending; this financial assistance is provided only to help [plaintiff] perform on this project." *Id.* Fifth, the SBA reasoned plaintiff would not be performing the primary and vital contract requirements. *Id.* at 2354–55. The SBA determined "[i]n addition to delivering oxygen supplies and providing basic instruction to the veteran customers, the primary and vital requirement of this contract also includes supplying the required ventilators, obtaining various oxygen supplies, providing respiratory services and respiratory specific training." AR at 2354–55. Plaintiff's COC application, however, "reveals that CSS will procure and store all required oxygen; clean and service oxygen-related equipment; lease warehouses and sublet space to [plaintiff]; provide all required equipment; provide all clinical respiratory services and respiratory-related training services." *Id.* In sum, the SBA Area Office concluded "it is clear that [plaintiff] is unduly reliant on its subcontractor for the instant procurement." *Id.* at 2356.

On 2 December 2019, the SBA Area Office notified plaintiff it was "ineligible for COC consideration as your firm is determined to be other than small under a formal size determination case number 1-SD-2020-02. In order to be eligible for COC consideration, a firm must qualify as a small business under the applicable size standard to the procurement at issue." *Id.* at 2409 (citing 13 C.F.R. § 125.5(b)).

## F. Appeal of the Size Determination to SBA OHA

On 2 December 2019, plaintiff appealed the Area Office's size determination to the SBA OHA. *Id.* at 2727. Plaintiff's "principal argument in the [appeal was] that the Area Office should have attached greater weight to [plaintiff's] claim that [plaintiff] will self-perform 81% of the contract work." *Id.* at 2728.

On 24 January 2020, the SBA OHA issued its decision affirming the size determination that plaintiff was other than a small business for the subject procurement. *See* AR at 2723. Notwithstanding plaintiff's later assertion that it would perform 81% of the work, OHA determined plaintiff's proposal indicated the contrary; "[i]ndeed, other than managing the contract, the proposal failed to ascribe [plaintiff] any significant role in contract performance." *Id.* at 2728. Plaintiff's proposal "identified numerous tasks that would be performed solely by CSS, including procuring and maintaining oxygen equipment and supplies, operating warehouses, and educating patients." *Id.* OHA therefore held "the Area Office did not err in concluding that [plaintiff] did not comply with the ostensible subcontractor rule, because CSS would be performing all, or nearly all, of the primary and vital contract requirements." *Id.* at 2729. Additionally, reasoning that "changes of approach occurring after the date to determine size do not affect a firm's compliance with the ostensible subcontractor rule because size is

assessed as of that specific date," OHA held "the Area Office properly based its decision on [plaintiff's] proposal of August 2, 2018, while ignoring any planned changes of approach occurring after August 2, 2018." *Id.* Lastly, addressing plaintiff's argument that it is not reliant on CSS because it "could instead have chosen to obtain such support from different subcontractors," OHA determined "such arguments fail because size is determined as of August 2, 2018," at which time plaintiff " planned to obtain support only from CSS, and there was no indication that [plaintiff] would utilize any other subcontractors." *Id.* For these reasons, OHA affirmed the Area Office's size determination because it "appropriately found that [plaintiff] would rely upon CSS to perform all, or nearly all, of the home oxygen delivery services." AR at 2730.

### G. Procedural History Before This Court

Plaintiff filed its complaint in this protest on 24 March 2020. *See* Compl., ECF No. 1. Pursuant to the Court's 26 March 2020 Order, on 27 March 2020, the parties filed a joint status report with a proposed schedule. *See* Order, ECF No. 5; Joint Proposed Schedule, ECF No. 6. The same day, on 27 March 2020, the Court held an initial telephonic status conference. *See* Order, ECF No. 5. Pursuant to discussions during the conference, on 31 March 2020, the parties filed an amended joint proposed schedule, in which the government confirmed its agreement to a voluntary stay of contract award pending resolution of this case. *See* Joint Status Report, ECF No. 7. Also on 31 March 2020, the government filed a motion for protective order, which the Court granted on 3 April 2020. *See* Unopposed Mot. for Protective Order, ECF No. 9; Order, ECF No. 10.

The government filed the administrative record on 1 May 2020. *See* Admin. R., ECF No. 11. Plaintiff filed its motion for judgment on the administrative record on 15 March 2020. *See* Pl.'s Mot. for J. on the Admin. R. & Mem., ECF No. 14 ("Pl.'s MJAR"). On 29 March 2020, the government filed its cross-motion for judgment on the administrative record and response to plaintiff's motion. *See* Def.'s Resp. in Opp'n to Pl.'s Mot. & Cross-Mot. for J. on the Admin. R., ECF No. 15 ("Def.'s MJAR"). On 5 June 2020, plaintiff filed its response to the government's cross-motion and reply in support of its motion. *See* Pl.'s Resp. in Opp'n to the Gov't's Mot. for J. on the Admin. R. & Reply in Supp. of Pl.'s Mot. for J. on the Admin. R. & Mem., ECF No. 16 ("Pl.'s Resp. & Reply"). On 12 June 2020, the government filed its reply in support of its cross-motion. *See* Def.'s Reply in Supp. of Cross-Mot. for J. on the Admin. R., ECF No. 17 ("Def.'s Reply"). The Court held a telephonic oral argument on the parties' cross-motions for judgment on the administrative record on 30 June 2020. *See* Order, ECF No. 18.

## II. Legal Standards

### A. Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act provides this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In rendering such judgment, this Court "review[s] the agency's decision pursuant

to the standards set forth in section 706 of title 5." *Id.* § 1491(b)(4). "Among the various [Administrative Procedure Act] standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). Under this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

### B. Judgment on the Administrative Record in a Bid Protest

Rule 52.1(c) of the Rules of the Court of Federal Claims "provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011). Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

This Court may set aside a contract award if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). "[D]e minimis errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Id.* (internal quotation marks omitted) (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992)). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced [it]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum, Inc.*, 404 F.3d at 1353.

### C. Permanent Injunction

When deciding whether a permanent injunction is warranted,

> a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

## III.  Analysis

### A.  The Parties' Arguments

Plaintiff frames the issue in this case as "whether a procuring agency may deem an otherwise successful proposal nonetheless defective under the ostensible subcontractor rule because the apparent awardee did not explicitly state the exact percentage of work it would self-perform."  Pl.'s MJAR at 1.  Plaintiff argues the SBA's size determination is arbitrary and capricious because it "relied on its finding that [plaintiff's] only opportunity to timely address the SBA's concerns was before August 3, 2018, which was well before the SBA even raised those concerns."  *Id.* at 5.  Plaintiff thus claims "OHA failed to follow the applicable regulations and SBA's own binding precedent, which make clear that [plaintiff] was not required to answer the SBA's questions before they were asked."  *Id.*  Plaintiff also argues "OHA improperly treated all evidence of compliance as inadmissible, making it impossible for [plaintiff] to prevail on the truthful merits of the case" because "[a]ll evidence showing that [plaintiff] will self-perform 81% of the work was improperly disregarded by the SBA as untimely."  *Id.*  Plaintiff further contends "the CO's merely speculative allegation that [plaintiff's] subcontractor would perform over 75% of the work is unsupported by the facts" because it claims "there is no support on the record showing that [plaintiff's] agreement to comply with all subcontracting limitations was defective."  *Id.* at 8.

The government responds, arguing "SBA's decision that [plaintiff's] proposal establishes that it and CSS, a large business, are affiliated under the ostensible subcontractor rule, which makes [plaintiff] ineligible for this small business set-aside contract, was rational and is supported by the record."  Def.'s Cross-MJAR at 11.  First, the government contends plaintiff's "proposal makes clear that CSS, not [plaintiff], will be the one performing the primary and vital requirements . . . to deliver oxygen and supplies to the veterans, and to provide respiratory services and respiratory specific training."  *Id.* at 12 (citing AR at 2354–55).  Second, highlighting portions of plaintiff's proposal demonstrating undue reliance on its subcontractor, the government asserts, "the fact that [plaintiff] lacks all the equipment, personnel, and experience to obtain this award on its own demonstrates that SBA rationally determined that [plaintiff] is affiliated with the large business for this award."  *Id.* at 14.  Next, responding to plaintiff's contention that the contracting officer should not have questioned plaintiff's responsibility after selecting it as the apparent awardee, the government argues "[b]ecause credible information existed in this case to lead the contracting officer to question whether [plaintiff] was responsible, he was required to refer it to SBA."  *Id.* at 16.  The government also responds to plaintiff's contention that SBA ignored evidence by stating "SBA did not deem [plaintiff's] after-the-fact self-serving statements as inadmissible[;] rather[,] it determined that these statements did not refute the totality of the evidence in the proposal, which demonstrated that [plaintiff] and CSS were affiliated under the ostensible subcontractor rule for this procurement."  *Id.* at 18.  Lastly, the government contends plaintiff is not entitled to a permanent injunction.  *Id.* at 19.

### B.  Plaintiff's Argument Related to Whether the Solicitation Required an Allocation of Work in the Proposal

In its motion for judgment on the administrative record, plaintiff seems to argue the SBA's request for information regarding the percentage of work plaintiff and its subcontractor would perform respectively was improper because the Solicitation did not require this information. Pl.'s MJAR at 1. Plaintiff requests "that the Court should find as a matter of law that Warrior was under no duty to provide this explicit statement at the time of bids." *Id.* To the extent this request concerns issues with bidding, the Court raised this concern during the oral argument, asking the parties whether this raised an issue of waiver of an argument required to be raised prior to the close of bidding or whether the bidding concern was more appropriately raised at the agency level. Tr. at 22:16–21.

Federal Circuit precedent provides, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007). The Federal Circuit reiterated this principle on 15 June 2020 in *Inserso Corp. v. United States*, explaining, "[w]e have since held that this reasoning 'applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so.'" 961 F.3d 1343, 1349 (Fed. Cir. 2020) (quoting *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012)).

Plaintiff responded to the Court's inquiry that there was no patent error in the solicitation, and plaintiff was not required to provide a percentage breakdown of the allocation of work between it and its subcontractor in the proposal because the Solicitation did not require that information. *See* Tr. at 23:5–14. The government, on the other hand, stated, "if, as the Court is reading this that Warrior is now seeking to say that the solicitation itself was wrong and . . . the solicitation should be read differently, we would agree with the Court that that would be a *Blue & Gold* waiver issue, if so." *Id.* at 26:13–19. To the extent plaintiff argues there was an ambiguity concerning the Solicitation's requirements, that is a pre-bidding issue and is waived. Additionally, to the extent plaintiff is arguing about the propriety of SBA's requests for additional information, the Court addresses that issue in the next section.

## C. Procedural Review of SBA Size Determination & OHA Decision

Plaintiff challenges the SBA OHA decision as arbitrary and capricious, primarily arguing it was not required to explicitly state the percentage of work it and its subcontractor would respectively perform, and the SBA inappropriately disregarded information plaintiff submitted as part of the COC application process, stating plaintiff would self-perform 81% of the work. Pl.'s MJAR at 5. Specifically, plaintiff asserts the SBA improperly ruled as untimely all evidence purportedly negating a finding of unusual reliance on its subcontractor. *Id.* The government responds, indicating the SBA did not consider such evidence "inadmissible," contrary to plaintiff's assertions. Def.'s Cross-MJAR at 17. Rather, the government asserts, "SBA noted that Warrior's response to SBA's questions could operate as an amendment to the initial proposal, to the extent that the new statement about self-performing 81 percent of the work could not be reconciled with Warrior's actual August 2, 2018 proposal." *Id.* at 17–18. "As such, Warrior's new statement cannot supersede and does not refute all of the information in the

proposal that show that as of the time of Warrior's proposal, when the size determination is made, Warrior and CSS were affiliated." *Id.* at 18 (internal citation omitted) (citing 13 C.F.R. § 121.404(d)).

"The Certificate of Competency (COC) program allows a small business to appeal a contracting officer's determination that it lacks the responsibility necessary to perform a specific government procurement on which it is an apparent successful offeror." AR at 766. "If the review indicates the [COC] applicant, including its affiliates is other than small SBA will initiate a formal size determination as set forth in § 121.1001(b)(3)(ii).  In such a case, SBA will not further process the COC application until a formal size determination is made." 13 C.F.R. § 121.408(a).  SBA provided plaintiff the opportunity to submit a COC application, which plaintiff submitted on 23 October 2019, but when SBA observed plaintiff's submissions gave "reason to question whether or not they have violated the ostensible subcontractor rule," SBA was required to initiate a formal size determination under 13 C.F.R. § 121.408(a).  AR at 775, 1353.  When determining plaintiff's size status and affiliation with its subcontractor, SBA was required to determine plaintiff's size "as of the date the concern submits a written self-certification that it is small to the procuring activity as part of its initial offer or response which includes price."  13 C.F.R. § 121.404(a).  During oral argument, the government recognized although "there were some procedural challenges in this case, . . . this case does not have any procedural anomalies." Tr. at 15:11–13.  Based on this record, SBA complied with all governing regulations and followed the proper procedure.

The SBA Area Office acknowledged plaintiff provided additional information requested by the SBA on both 7 November 2019 and 15 November 2019.  AR at 2351.  The Area Office also acknowledged plaintiff's statement that its subcontractor would be performing only 19% of the work.  *Id.* at 2355 n.6.  The Area Office explained, however, it "determines the size status of a concern, including its affiliates, as of the date the concern submits a written self-certification that it is small to the procuring activity as part of its initial offer (or other formal response to a solicitation) which includes price." *Id.* at 2351 (citing 13 C.F.R. § 121.404(a)).  Therefore, the SBA Area Office reasoned because plaintiff submitted its offer on 2 August 2018, it must determine plaintiff's size as of that date. *Id.*  Furthermore, reviewing the Area Office size determination, the SBA OHA acknowledged plaintiff's "principal argument . . . that the Area Office should have attached greater weight to [plaintiff's] claim that [plaintiff] will self-perform 81% of the contract work." *Id.* at 2728.  OHA explained, though, similarly to the Area Office, "pursuant to 13 C.F.R. § 121.404(d), [plaintiff's] compliance with the ostensible subcontractor rule is determined as of the date of its proposal for the subject procurement." *Id.*  OHA observed, just like the Area Office, that plaintiff submitted its proposal on 2 August 2018, and as of that date, plaintiff's "proposal did not indicate that [plaintiff] will self-perform 81% of the work." *Id.*  OHA also noted plaintiff did "not attempt[] to explain how the COC Proposal can be reconciled with [its] proposal of August 2, 2018." *Id.* at 2729.  It was proper for SBA to ask plaintiff for additional information about its proposal, but SBA was required to make its own independent determination of how much work the proposal indicated each party would be performing as part of its size determination.  In making its formal size determination, it was also reasonable for SBA to conclude that plaintiff's representation that it would self-perform 81% of the work could not be reconciled with the proposal's overwhelming indication of plaintiff's reliance on its subcontractor. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d

1071, 1085 (Fed. Cir. 2001) ("Under [the Administrative Procedure Act] standard, the agency's action is entitled to a presumption of regularity, and the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered.") (internal quotation marks and citation omitted).

Moreover, nowhere in either the Area Office or OHA decision do SBA personnel rule plaintiff's evidence was "untimely" or "inadmissible." Rather, both the Area Office and OHA enforced SBA regulations, which provide "SBA determines the size status of a concern, including its affiliates, as of the date the concern submits a written self-certification that it is small to the procuring activity as part of its initial offer or response which includes price." 13 C.F.R. § 121.404(a). The Area Office and OHA both appropriately considered plaintiff's proposal as of 2 August 2018 to determine its size status for this procurement. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 (Fed. Cir. 2003) (first citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218–19 (2001), then citing *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed. Cir. 2001)) ("[W]e give deference to an agency's permissible interpretation of its own regulations."); *see also Eagle Design & Mgmt., Inc. v. United States*, 57 Fed. Cl. 271, 273 (2002) (quoting *Ceres Envtl. Serv., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002)) ("In reviewing the OHA judge's determination, special deference is shown because of the SBA's 'quasi-technical administrative expertise and [its] familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme.'"). Accordingly, it was not arbitrary and capricious for the SBA to disregard later-submitted representations which conflicted with plaintiff's 2 August 2018 proposal.

### D. SBA Ostensible Subcontractor Analysis

Congress defined a small business as "one which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). In addition, Congress delegated authority to the Administrator of SBA to establish definitions and standards for small businesses. *Id.* at § 632(a)(2)(A). SBA adopted the North American Industry Classification Manual ("NAICS") for size standards and assigns a size standard to each NAICS industry code. 13 C.F.R. § 121.101. Specifically, in establishing size standards, "SBA considers economic characteristics comprising the structure of an industry, including degree of competition, average firm size, start-up costs and entry barriers, and distribution of firms by size." *Id.* at § 121.102(a). SBA's size standards "seek to ensure that a concern that meets a specific size standard is not dominant in its field of operation." *Id.* at § 121.102(b).

To determine a concern's size, "SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit." *Id.* at § 121.103(a)(6). Affiliation exists between a concern and another entity "when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists." *Id.* at § 121.103(a)(1). "In determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation." *Id.* at § 121.103(a)(5). SBA considers the following factors to determine affiliation: "ownership,

management, previous relationships with or ties to another concern, and contractual relationships." 13 C.F.R. § 121.103(a)(2).

Under SBA's affiliation regulations, "[a] contractor and its ostensible subcontractor are treated as joint venturers for size determination purposes." *Id.* at § 121.103(h)(4).  This rule, more commonly known as the "ostensible subcontractor rule" further provides:

> An ostensible subcontractor is a subcontractor that is not a similarly situated entity, as that term is defined in § 125.1 of this chapter, and performs primary and vital requirements of a contract, or of an order, or is a subcontractor upon which the prime contractor is unusually reliant.  All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

*Id.*  SBA case law has identified four key factors demonstrating unusual reliance on a subcontractor:  (1) "the proposed subcontractor is the incumbent contractor and is ineligible to compete for the procurement;" (2) "the prime contractor plans to hire the large majority of its workforce from the subcontractor;" (3) "the prime contractor's proposed management previously served with the subcontractor on the incumbent contract;" and (4) "the prime contractor lacks relevant experience and must rely upon its more experienced subcontractor to win the contract." AR at 2355 (SBA Area Office decision citing line of SBA size appeals stemming from *Size Appeal of DoverStaffing, Inc.*, SBA No. SIZ-5300 (2011)).

Both parties relied on the Federal Circuit's decision in *Tinton Falls Lodging Realty, LLC v. United States* as support for their respective positions.  That case involved a challenge to the SBA OHA's affirmance of the SBA Area Office's size determination.  800 F.3d 1353, 1358 (Fed. Cir. 2015).  The procurement at issue contemplated provision of hotel management services to coordinate hotel rooms and transportation for federal civilian mariners completing training at the Military Sealift Command ("MSC") Training Center.  *Id.* at 1355.  A losing bidder initiated an SBA size protest challenging the successful bidder's size status because the successful bidder "intended to subcontract the lodging services portion of the contract—which accounted for more than 80% of the value of the contract—to hotels that did not qualify as small businesses" and was therefore unusually reliant on subcontractors in violation of the ostensible subcontractor rule.  *Id.* at 1356–57.  The SBA Area Office determined the primary and vital requirements of the contract were "the management and coordination of lodging and transportation services to MSC."  *Id.* at 1357.  On appeal, the SBA OHA agreed with the Area Office that "the contract's primary and vital requirements [were] coordinating hotel rooms and transportation services to meet MSC's needs."  *Id.*  The Court of Federal Claims "determined that the SBA-OHA had a rational basis for its conclusion that the primary purpose of the solicitation was a coordinated package of rooms, transportation, and services to meet MSC's fluctuating needs."  *Id.*  Despite the protestor's contention that the primary and vital requirements were the provision of lodging, the Federal Circuit reasoned, "the solicitation requires more than

- 17 -

simply a fixed block of hotel rooms for a certain period of time; rather, the contractor must be able to secure an unpredictable and widely-varying number of acceptable hotel rooms on short notice." *Tinton Falls Lodging Realty*, 800 F.3d at 1362.  Therefore, "even though no management and coordination tasks are expressly identified, there is no question that the solicitation requires management and coordination to supply a potentially large and varying number of hotel rooms with little or no notice." *Id.*  On this record, the Federal Circuit accordingly held the SBA OHA decision "provided a coherent and reasonable explanation of how it determined that the primary and vital requirements of the contract were the management and coordination of a package of lodging and transportation services." *Id.* at 1363.

The government relies on *Tinton Falls* "because it stands for the proposition that SBA is the entity tasked by Congress with determining what constitutes a small business." Tr. at 76:21–24.  As that case applies to the instant case, the government contends "under the rules and the standards set forth in *Tinton Falls*, the SBA had to determine whether or not that arrangement [plaintiff had with its subcontractor] was one that should be evaluated under the affiliate rules . . . and found that[] this combined entity of Warrior/CSS did not meet the small business size requirements for this procurement." *Id.* at 77:3–10.  Plaintiff similarly relies on *Tinton Falls* "because in that case, they went through the facts and they found that . . . the mere coordination of hotel rooms and transportation was the most complex task in the solicitation. So . . . Warrior meets the threshold of *Tinton Falls* very easily." *Id.* at 77:25–78:6.  Further, plaintiff posits, "this case is like *Tinton Falls* except that the contractor at issue is planning to either buy the hotels or use other hotels.  That's what we have here." *Id.* at 78:10–12.

The Court understands plaintiff's argument regarding the similarity of the instant case with *Tinton Falls* to imply plaintiff's management role in performing the contract suffices for purposes of finding plaintiff's proposal does not run afoul of the ostensible subcontractor rule.  Even if that were the case, like the Area Office stated in its size determination, the "ostensible subcontractor analysis is intensely fact specific and is driven by the specific requirements of each solicitation and the individual offeror's response to those requirements in its proposal."  AR at 2352 (citing *Size Appeal of Four Winds Services, Inc.*, SBA No. SIZ-5260 (2011)).  Consequently, whatever primary and vital contract requirements a prime contractor or its subcontractor performs will be procurement-specific and cannot bear on the ostensible subcontractor analysis under a different procurement.  Regardless, as OHA noted in its decision, it "has long held that a prime contractor cannot comply with the ostensible subcontractor rule merely by supervising a subcontractor in its performance of the work." *Id.* at 2728–29.

Plaintiff contends the Solicitation does not require the ten years of experience requirement be met solely by the offeror and the Solicitation does not prohibit hiring a subcontractor. Pl.'s Resp. & Reply at 1.  Plaintiff therefore argues it was "arbitrary and capricious for the government to assign an unfavorable [past performance] rating to Warrior." *Id.* at 2.  The government counters this point, arguing "[r]estrictions applicable to an agency's evaluation of past performance have no bearing on SBA's size determination, and Warrior has failed to cite any authority to establish that past performance evaluation techniques apply to SBA size determinations." Def.'s Reply at 5.  Plaintiff references the Solicitation's provision that the lack of past performance cannot result in an unsatisfactory rating for the past performance factor, *see* AR at 173, however, there is no indication in the record the VA gave plaintiff any rating in

its evaluation of plaintiff's past performance.  Regardless, the VA's consideration of plaintiff's past performance, which it was required to consider under the Solicitation's evaluation scheme, does not impact an SBA size determination.  As part of a size determination, the SBA merely considers factors relevant to size status and affiliation under its own regulations, not any proposal evaluation scheme binding on the procuring agency.  *See* 13 C.F.R. § 121.103.

Even assuming the Solicitation does not require the ten years of experience be solely satisfied by the offeror, past experience is relevant to an affiliation analysis under the ostensible subcontractor rule.  One of SBA's four key factors for finding unusual reliance in violation of the ostensible subcontractor rule is "the prime contractor lacks relevant experience and must rely upon its more experienced subcontractor to win the contract."  AR at 2355 (SBA Area Office decision citing line of SBA size appeals stemming from *Size Appeal of DoverStaffing, Inc.*, SBA No. SIZ-5300 (2011)).  SBA OHA has upheld this principle in similar cases.  For example, in *Bama Company*, SBA No. SIZ-4819 (2006), OHA upheld a determination the contractor was other than small because its proposal failed to state any of its own relevant past experience, instead citing only to its subcontractor's experience.  Similarly, in *B&M Construction, Inc.*, SBA No. SIZ-4805 (2006), OHA upheld a determination the contractor violated the ostensible subcontractor rule because its proposal did not present any relevant past experience of its own and demonstrated all key personnel who would perform the primary and vital requirements were employees of the subcontractors.  Likewise, in *STA Technologies., Inc.*, SBA No. SIZ-4790 (2006), OHA concluded the contractor did not have any relevant experience and depended on its subcontractor to obtain the necessary financing and equipment to perform the contract.  Moreover, Court of Federal Claims case law parallels OHA's consistent consideration of past performance in determining affiliation under the ostensible subcontractor rule.  In *Ideogenics LLC v. United States*, 138 Fed. Cl. 672 (2018), this Court found the lack of past performance and the extent to which the prime contractor relied on its subcontractor for staffing were relevant factors in upholding an SBA determination that the protestor was other than small.

Similar to SBA's reasoning in the above cases, here, the Area Office also found it relevant that "[a]s of the date of proposal, [plaintiff] only has experience with Durable Medical Equipment (DME) delivery services contracts; they do not have any home oxygen delivery services contract experience."  AR at 2353.  The Area Office noted plaintiff "uses CSS's vast respiratory services contracts experience to meet the solicitation [requirement of a] 'minimum of ten (10) years of experience in providing Home Oxygen delivery services.'"  *Id.*  Referencing plaintiff's proposal, the Area Office observed plaintiff "only listed CSS's projects which were performed within the last three years."  *Id.*  The Area Office's observations are consistent with the record before the Court.  As it concerns plaintiff's own experience, the first substantive page of plaintiff's proposal only lists its Durable Medical Equipment experience in one paragraph.  *Id.* at 237.  Plaintiff then uses nearly two full pages detailing CSS's experience with home oxygen delivery services.  *Id.* at 237–39.  Further, the first paragraph of the proposal contains the following language in bold:  "Throughout this proposal, as *teaming partner* of [Warrior], CSS is referenced as WSC-CSS."  *Id.* at 237 (emphasis added); *see also* Tr. at 28:14–15 (plaintiff's counsel explaining plaintiff and CSS "were a team for purposes of the proposal").  From the outset of the proposal, the reviewer can glean that CSS will play a significant role as the only "teaming partner" with proven experience in home oxygen delivery services.

During oral argument, the Court requested clarification from plaintiff regarding its experience in performing the primary and vital requirements of this contract. The Court asked counsel for plaintiff if "Warrior or any of its employees have experience with setting up home oxygen systems," and counsel for plaintiff responded, "[a]t this particular juncture, I believe no." Tr. at 29:20–24. Next, the Court asked counsel for plaintiff if "Warrior employ[s] any technicians, registered respiratory therapists or certified respiratory therapists." *Id.* at 30:5–7. Counsel for plaintiff answered, "I don't have an answer to that question." *Id.* at 31:2–3. The Court also asked whether plaintiff has "experience educating patients on how to use home oxygen systems," but in response counsel for plaintiff questioned the relevancy of such experience. *Id.* at 31:5–9. To the best of his knowledge, counsel for plaintiff did not believe plaintiff had "registered respiratory therapists or experience educating patients on home oxygen systems." *Id.* at 32:1–4. Plaintiff did not directly answer the Court's question asking what the primary and vital requirements of the contract were. *See id.* at 32:5–33:16.

Later during oral argument, plaintiff sought to clarify its past experience by referencing its COC Proposal, which demonstrated plaintiff would deliver armrests, beds, scooters, shower chairs, and grab bars. *Id.* at 59:5–10. Plaintiff further clarified that it also services these items, including "very complicated hospital beds." *Id.* at 59:10–12. Plaintiff thus asserted, "absent the government [being] able to show some sort of reason why oxygen tanks are so terribly special that they need to be treated completely differently than everything else that the government is buying within the durable medical goods spectrum, the government's position is not justifiable even on the lack of experience issue" because plaintiff is "working on much more complicated issues, such as hospital beds [and] lift repairs." *Id.* at 59:17–23, 60:1–2. The Solicitation, however, required the contractor to obtain all licenses required to perform and clarifies that respiratory care practitioners are "[i]ndividuals who are duly recognized as credentialed/*licensed* Registered Respiratory Therapist (RRT) or Certified Respiratory Therapist (CRT)." AR at 117, 128 (emphasis added). These requirements imply that home oxygen delivery services are "so terribly special" as to necessitate licensure to perform. Plaintiff's proposal even acknowledges "Clinical Respiratory Services . . . require the expertise of a trained professional." *Id.* at 237. Moreover, in response to the Solicitation's instruction to "[p]rovide copies of required licenses . . . or training certifications for each employee proposed to work on the contract," plaintiff submitted copies of the relevant respiratory care licenses for proposed employees, notably alongside their CSS training evaluations, indicating these are CSS's licensed employees. *See id.* at 171, 486–571.

Plaintiff also argues the "government speculates that Warrior's subcontractor will perform essentially all the work," a speculation unsupported by the record. Pl.'s Resp. & Reply at 2. In an attempt to provide such support, plaintiff asserts "not all [contract line item numbers ("CLINs")] are the same as it relates to small business participation." *Id.* at 3. Plaintiff points to the SBA's class waiver list, explaining, "[t]he SBA issues a class waiver when no small business manufacturer exists for a class of products. Class waivers remain in place until the SBA is notified of a small business manufacturer that can provide the product to the government." *Id.* Plaintiff indicates certain items relevant to this contract, such as oxygen tanks and CPAP machines, are on the SBA's class waiver list. *Id.* It seems, therefore, plaintiff maintains it was proper to subcontract work related to these items to other than a small business, a fact "[t]he SBA failed to examine." *Id.* The government responds to this line of argumentation, first

asserting, "[t]he solicitation clearly prohibits the awardee under this procurement from outsourcing all work under this contract award" because this procurement "is subject to limitations on subcontracting." Def.'s Reply at 2–3. Next, the government explains that plaintiff's "reference to the non-manufacturer rule class waiver list is misplaced as that rule does not apply in this case . . . because the rule does not apply to service contracts . . . and the contract being solicited in this case is a service contract." Def.'s Reply at 6.

To the extent plaintiff challenges the SBA OHA decision on the grounds that it erroneously found plaintiff "will not perform any work on the contract," such an argument is a gross exaggeration. Pl.'s Resp. & Reply at 2. Indeed, OHA never explicitly stated plaintiff would not perform *any* work. Rather, OHA stated "other than managing the contract, the proposal failed to ascribe [plaintiff] any significant role in contract performance." AR at 2728. OHA cited plaintiff's proposal as demonstrating "numerous tasks . . . would be performed solely by CSS, including procuring and maintaining oxygen equipment and supplies, operating warehouses, and educating patients." *Id.*

Moreover, to the extent plaintiff argues certain CLINs of the contract must be performed by a large business subcontractor, FAR 52.219-14, which places limitations on subcontracting, does not differentiate between the number of CLINs the prime contractor and subcontractor respectively perform. That provision requires a contractor to certify, "[b]y submission of an offer and execution of a contract, . . . that in performance of . . . the contract for [services], [a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." FAR 52.219-14(c)(1). FAR 52.219-14 thus focuses on total labor costs allocated to employees of the prime contractor versus employees of a subcontractor and ensuring at least half the total labor costs be allocated to the prime contractor. *See id.* Therefore, even if plaintiff's subcontractor only performs seven of the contract's alleged 5,018 CLINs, as outlined in the quotation CSS provided plaintiff,[9] this allocation of CLINs between parties is irrelevant to analyzing whether plaintiff's bid violated FAR 52.219-14(c)(1) as applied to the allocation of subcontracted work. If the labor costs associated with the seven CLINs allocated to CSS exceed 50% of the total labor costs for contract performance, such arrangement would violate the limitations on subcontracting as set forth in FAR 52.219-14(c)(1). *See also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 (Fed. Cir. 2009) (quoting *Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 527 (2005), *aff'd* 163 F. App'x 889 (Fed. Cir. 2006)) ("[A] proposal that, on its face, leads 'an agency to the conclusion that an offeror could not and would not comply with the subcontracting limitation' is technically unacceptable and 'may not form the basis for an award.'"); *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 755 (2006) ("An agency's judgment regarding whether a small business will comply with the subcontracting limitation involves a responsibility determination, which is a matter committed to the discretion of the contracting officer.").

---

[9] To the extent plaintiff attempts to rely on the "quotation letter" as a basis for the allocation of work to be performed on the contract, the "quotation letter" is dated 22 October 2019, over a year following plaintiff's original proposal submission on 2 August 2018. *See* 13 C.F.R. § 121.404(a) ("SBA determines the size status of a concern, including its affiliates, as of the date the concern submits a written self-certification that it is small to the procuring activity *as part of its initial offer* or response which includes price." (emphasis added)).

### E.  Purported $5 Million Loan from CSS to Plaintiff

Plaintiff also challenges the SBA's reference to a purported $5 million loan from CSS to plaintiff.  *See* Pl.'s Resp. & Reply at 5 ("There is no teaming agreement, there is no joint venture agreement, and there is no $ 5 million loan.").  The Area Office noted in its decision that plaintiff's "COC application reveals that [plaintiff] will receive a loan from CSS valued at over $5 million to cover all the equipment and startup working capital.  CSS is not in the business of lending; this financial assistance is provided only to help [plaintiff] to perform on this project. The terms of this loan are unclear at this time."  AR at 2354.  Notwithstanding plaintiff's contentions before the Court that such a $5 million loan is "nonexistent," Pl.'s Resp. & Reply at 7, OHA noted "[d]uring the size review, [plaintiff] disclosed that it will obtain a $5 million loan from CSS to cover startup costs."  AR at 2726.  OHA also stated in its decision that plaintiff "argue[d] that it was reasonable for it to obtain a $5 million loan from CSS because 'no subcontractor would release $5 million in equipment without any collateral.'"  *Id.* at 2727.  A close review of the administrative record reveals a $5.015 million loan included as "Start-up working capital" in financial documents plaintiff submitted to SBA.  *Id.* at 1332–33.

Upon request for clarification during oral argument, plaintiff could not provide explanation for what the loan is and could not point to detail in the administrative record clarifying the loan issue.  First, counsel for plaintiff agreed with the Court's characterization of the loan as "startup working capital that [plaintiff] would need, but nothing affiliated . . . with the subcontractor."  Tr. at 9:13–15.  Later in the argument, when the Court pointed to OHA's reference to the $5 million loan, plaintiff clarified that "CSS is going to be gathering equipment . . . to give to Warrior," and OHA was referencing "the gearing up of equipment."  *Id.* at 63:8–9, 13–14.  Plaintiff therefore seems to characterize the $5 million loan as a loan of equipment from CSS to plaintiff.  *See id.* 63:8–9.  The government responded that irrespective of how the "loan" is characterized, "what is clear here is that Warrior itself does not have the money to be able to go out and purchase all [the equipment needed to perform].  So it's entering into some sort of arrangement with CSS whereby CSS is going to provide all of the materials, and potentially at some point Warrior may pay all of that off."  *Id.* at 66:13–18.

Plaintiff does not dispute the existence of a $5 million arrangement with CSS, but rather disputes SBA's characterization of this arrangement as a loan.  Plaintiff's argument thus asks the Court to find SBA's decision arbitrary and capricious based on nothing more than a semantic difference in what constitutes a "loan."  The fact remains undisputed that the record indicates CSS was to provide plaintiff $5 million in assistance, whether this is characterized as a financial loan, startup working capital, a loan of equipment, or any other term.  Even if the arrangement between plaintiff and its subcontractor is not properly characterized as a "traditional loan," SBA's characterization as such is insufficient grounds to find the OHA decision arbitrary and capricious.  *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1085 ("Under [the Administrative Procedure Act] standard, the agency's action is entitled to a presumption of regularity, and the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered.") (internal quotation marks and citation omitted).

### F.  Neither the Area Office Size Determination nor the OHA Decision was Arbitrary and Capricious

Plaintiff's proposal relied upon its subcontractor to demonstrate prior experience in home oxygen deliveries and set ups, patient education, and oxygen equipment maintenance, which are among the primary and vital requirements of the subject procurement.  Upon review of plaintiff's proposal, despite once being considered the apparent awardee, the CO was concerned with the proposal's overreliance on a subcontractor, a large business, to perform these primary and vital requirements.  When reviewing plaintiff's proposal during the COC process, the SBA was likewise concerned with plaintiff's reliance on a large subcontractor to perform certain requirements.  The SBA was therefore dutybound to initiate a formal size determination to determine plaintiff's size status for this procurement.  The Area Office reviewed plaintiff's proposal, as it was obligated to do, and reasonably determined plaintiff's proposal demonstrated undue reliance on its subcontractor to meet the primary and vital requirements of the contract.  On appeal, the OHA affirmed the Area Office's size determination because the proposal plainly delegated a key role in contract performance to plaintiff's subcontractor.  The Court joins each of these prior reviewers in finding plaintiff's proposal places undue reliance on plaintiff's subcontractor in violation of the ostensible subcontractor rule.  The Court declines plaintiff's invitation to disturb the decision of the OHA.  The OHA complied with governing SBA regulations by reasonably determining plaintiff's size as of the date it submitted its offer, and thus such a determination was not arbitrary and capricious.  *Advanced Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

### G.  Injunctive Relief

In its motion for judgment on the administrative record, plaintiff appears to request a permanent injunction.[10]  *See* Pl.'s MJAR at 10 ("This Court should accordingly enter an order . . . ordering VA to make award to the apparent awardee Warrior.").  As previously stated, the Court considers the following factors when determining whether to issue a permanent injunction:  "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  *PGBA, LLC*, 389 F.3d at 1228–29.  Turning first to factor one, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits.  The Court therefore does not reach the remaining prongs of the test for a permanent injunction.  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

## IV.  Conclusion

The Court has considered all arguments plaintiff raised.  To the extent not discussed herein, plaintiff's other arguments are unpersuasive, meritless, or unnecessary for resolving the issues currently before the Court.  For the foregoing reasons, the Court finds nothing arbitrary

---

[10] The government indicates in its cross-motion that plaintiff did not adequately allege or address the necessary criteria for a permanent injunction in its motion.  Def.'s MJAR at 19.

and capricious in the SBA Area Office's size determination nor the OHA decision affirming the size determination.  The Court therefore **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** the government's cross-motion for judgment on the administrative record.

       **IT IS SO ORDERED.**

                            <u>s/ Ryan T. Holte</u>
                            RYAN T. HOLTE
                            Judge